## Case No. 9,751.

### In re MOORE.

### [1 Hask. 134.] [1]

District Court, D. Maine. Feb., 1868.

BANKRUPTCY—DISCHARGE—FRAUD—CONCEALMENT OF PROPERTY—EVIDENCE.

1. The discharge of a bankrupt is not prevented by transactions prior to the bankrupt act [of 1867 (14 Stat. 517)].

2. A specification in bar of a bankrupt's discharge, stating that he concealed the title to land, is not sustained by proof of his omitting an equity of redemption from his schedule of assets.

3. Such specification. charging that the bankrupt willfully and knowingly swore falsely in his examinations, to be effectual, must be proved beyond a reasonable doubt.

4. Evidence of verbal admissions is both unreliable and dangerous.

[Cited in Re Goold, Case No. 5,604.]

In bankruptcy. Petition by bankrupt [Luther S. Moore,] for his discharge. Creditors specified objections thereto: I. That he fraudulently conveyed his property for the purpose of concealing it, and to prevent its attachment. II. That he concealed his title to land. III. That he concealed his promissory note. IV. That he concealed the "Laconia property." V. That in his examination before the register, he willfully and knowingly swore falsly in regard to the keeping of books of account.

Josiah H. Drummond and Woodbury Davis, for petitioner.

Almon A. Strout and George F. Shepley, for objecting creditors.

FOX, District Judge: A very protracted examination has been had of the bankrupt by the assignee before Mr. Register Fessenden. It appears that the bankrupt failed on the 31st day of August, A. D. 1863, and filed his petition in this court to be adjudged a bankrupt on the day the bankrupt act took effect. At the time of his failure he was owing about $60,000, more than $40,000 of which was due to the banks in this city and the county of York, for loans made to him on his paper, purporting to be indorsed by Jeremiah M. Mason.

The bankrupt has for many years been in the practice of the law at Limerick, in the county of York, and also extensively engaged in the purchase and sale of real estate. His homestead farm, upon which he had made very costly expenditures and improvements, was mortgaged by him, on the 28th day of August, 1863, to his brother-in-law, H. P. Storer of Portland, to secure the payment to him, in eight years, of Moore's note for $10,000.

The first specification charges that this mortgage was fraudulently given for the purpose of concealing the property, and to prevent its attachment, and that the bankrupt, at the time of filing his petition, was the owner of this estate. The evidence, in my opin-ion, not only fails to prove such to have been the condition of this estate, but rather establishes beyond question, that at the time this mortgage was executed, Moore was indebted to Storer to the amount of $2,000, which debt was then cancelled, and $8,000 was paid in cash to Moore by Storer at the time, or within a few days afterwards, and the note and mortgage for this sum were then given by Moore to Storer, the whole amount of which still remains unpaid.

It must be remembered that this transaction took place in 1863, prior to the passage of the bankrupt act, and although I am well satisfied that the bankrupt at the time of his giving this mortgage was well aware of his insolvency, and intended to secure and prefer the debt to Storer, and place his estate beyond the reach of his creditors, acts which are now prohibited by the bankrupt act, and which would deprive him of his discharge if committed subsequently to the passage of this act, yet, it is quite clear, the bankrupt law cannot be made to have a retroactive effect, and punish a party, by refusing him a discharge for acts committed by him prior to the passage of the law. A fraudulent preference or transfer of a debtor's property, by the act, is made an offence, for which the punishment prescribed by the act is, a failure to obtain his discharge. To thus punish a party, the offence for which the punishment is inflicted must have been committed since the passage of, and in violation of a law then in force. Such was the decision in this district in Clark's Case [Case No. 2,795a], in July last, and it has been repeatedly so decided in other districts, and with much force by Field, J., in Rosenfield's Case [Id. 12,058], where he held, that neither a fraudulent conveyance made, nor a fraudulent preference given before the passage of the bankrupt act, is good ground upon which to oppose a discharge; and a specification. alleging such a conveyance or preference, should be stricken out on motion.

The second specification charges the bankrupt with a concealment of his interest in the Gilpatrick lot by a conveyance, made by Gilpatrick to Lorenzo Moore, the brother of the bankrupt, for the use and benefit of the bankrupt. The bankrupt conveyed this lot in the spring of 1863 to Gilpatrick by an absolute deed, which was intended as security for the payment of $1,760, due from Moore to Gilpatrick. A bond of defeasance was at the time executed by Gilpatrick to Moore, as appears from the examination of the bankrupt. Gilpatrick also received from Moore his notes for the amount due, one of which was paid from the proceeds of a sale of a portion of the property, and the other two were paid before their maturity, in May, 1865, by the bankrupt, with money, as he swears, belonging to his brother Lorenzo, and Gilpatrick thereupon released the bond to Lorenzo.

The deposition of Lorenzo Moore was read

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

by the orators at the hearing; he testifies that after studying law with his brother, he went to Independence, Iowa, there practiced his profession, and was also engaged in speculations in real estate, occasionally remitted to his brother money for investment, and finally in 1864, returned back, having accumulated about $12,000; that in 1865 he was at his father's house in Newfield, saw his brother quite frequently, his brother was then indebted to him in the sum of $1,500 or $1,600 for borrowed money for which he held Luther's note, and for which he afterwards took some property of Gilpatrick in payment; that Luther held Gilpatrick's bond for the conveyance of this property, and he gave up to Luther his note and received from Gilpatrick his deed in payment, authorized Luther to make this arrangement a few days before it was made; that the deed is dated May 1, 1865, and has been in his own possession ever since the 3d or 4th of the month; that the consideration of this conveyance was the surrender of the note for $1,500, he held against Luther; that he gave the note to Luther, and Luther paid him the balance in cash beyond the $1,500 allowed Gilpatrick, and that he has received rent of the Gilpatrick lot since.

There is nothing cotradictory of this testimony presented by the creditors. It fully corroborates the bankrupt's statement, and establishes the fact that Lorenzo paid for the transfer from Gilpatrick. This transfer was however in its legal effect, an assignment of a mortgage; for by the laws of Maine, the conveyance to Gilpatrick with a bond of defeasance executed at the same time by him constituted a mortgage security for the amount of Moore's liability to him, so that, at the time of the filing of the petition by the bankrupt, he held an equity of redemption of the estate, and was entitled to redeem it from his brother on payment of the balance due; this equity nowhere appears upon the schedules annexed to his petition in bankruptcy.

The specification does not accuse the bankrupt of concealing an equity of redemption in the estate, but it charges the concealment of a parcel of land, being the same premises conveyed to Jacob Gilpatrick of the value of $2,000, by causing a conveyance of the same land to be made to the brother of the bankrupt, "he the said bankrupt falsely pretending, that said Lorenzo advanced the money to purchase said land, and that said Lorenzo was and is the true owner thereof, when in truth and in fact the said bankrupt is the true owner of said land, and ever has been the true owner of the same since said conveyance to Lorenzo Moore, and advanced the money to pay the incumbrance on the same, and to obtain the title to the same, and the said Lorenzo Moore, holds said real estate for said Luther S. Moore, whereby the said Luther S. Moore concealed the same, and still conceals the same and the money paid therefor, with the intent to defraud his creditors, and to prevent the attachment and seizure on execution of said real estate, and to prevent its coming into the hands of the assignee in bankruptcy, and has omitted the same from his schedules annexed to his petition in bankruptcy, although he was the owner of the same, contrary to the said bankrupt act."

This is the entire specification touching this estate, and it will be observed, it is based upon the ground that the bankrupt was the owner of the entire estate, and had paid; his own money to relieve the incumbrances upon it, and was fraudulently using the name of Lorenzo to conceal the bankrupt's interest in this property, which belonged to him absolutely. This was the charge the bankrupt was called upon to meet, by the specification, a fraudulent concealment of an entire, an absolute title to the Gilpatrick lot, and not an equity of redemption; and this charge is disproved entirely by the evidence produced by the opposing creditors.

It was claimed at the argument that the bankrupt had concealed his interest in this equity, and for this cause should be refused a discharge. It is a sufficient reply to this, that a concealment of the equity, as I have shown, is not set forth in any of the specifications as a reason for opposing his discharge, and of course should not be.thus first presented at the hearing, without an opportunity for the bankrupt to defend against it. The equity is not mentioned on the schedules of assets, but it was clearly and fully disclosed by the bankrupt in .his examination, as he states, he received the bond from Gilpatrick. Whether this right to redeem is of any real value is quite uncertain; the amount secured to Gilpatrick at the time of the conveyance in 1863 was $1,760; $500 of the principal with interest was paid by a sale of a portion of the estate, and the balance remains unpaid. The only testimony, as to the value of the property, is from the bankrupt, who estimated it to be worth' at the time of the conveyance about $1,800, and from Gilpatrick who thought its then fair cash value was $2,200; it is doubtful whether the property is now worth the amount of the incumbrance.

To preclude a bankrupt's discharge by a concealment of his property, it must have been willful concealment, designedly done by him, and not merely an accidental omission to set forth his interest in the property. In the present case, all the facts were disclosed by the bankrupt himself, and upon all the evidence in the case, it is not at all clear to me, that there was any real value or interest in the estate to be concealed by him; but I think the schedule is defective, and should be amended, setting forth the equity in the Gilpatrick lot, that the same may be disposed of by the assignee, if anything can be realized therefrom.

The third specification charges the concealment of a note, signed by one I. G. Harmon, payable to Calvin Moore, the note being the property of the bankrupt. I do not think

this charge is sustained by the evidence. The bankrupt does not appear to have had any right or interest in the Harmon note. The fourth specification relates to the Laconia Stand, and charges the bankrupt with concealing this estate, by causing a conveyance of the same to be made to, and remain in, Lorenzo Moore, the bankrupt falsely pretending that Lorenzo paid for the property, when in fact, the bankrupt was the owner of it, and purchased and paid for the same with his own money, and caused a conveyance to be made to Lorenzo for the sole purpose of concealing the same.

The facts respecting this estate are somewhat complicated; but I understand that Leander Boothby was once the owner of the estate, encumbered by mortgages which were about becoming foreclosed; that in 1860 he applied to Wm. Bean to lend him money to redeem the estate, and an arrangement was made by which the title was conveyed by Leander Boothby to his wife, who received $700 from Bean, she giving him a warranty deed of the estate, and he at the same time giving to her a bond to reconvey the estate to her within three years, on payment of the loan with heavy interest. This loan was applied to the discharge of the incumbrance. The business was done at the bankrupt's office. In June, 1863, a claim was made by the bankrupt, in behalf of Flanders & Co., on this estate by virtue of an alleged prior attachment. Bean was notified of this claim, and becoming somewhat alarmed, proposed to Moore to convey to him the interest he had in the property, on payment of the amount he had loaned, $700, losing his interest for three years, which he says was to be nearly $200. Moore accepted the proposal, and received from Bean, in the fall of 1863, a bond running to Lorenzo Moore, binding Bean to convey the estate if it was not redeemed, and if redeemed to pay over the amount received. Moore paid Bean $400 in cash, and offered him a draft or something or other for $300, as Bean says, "which he considered as good as cash when he could get to a bank with it," but upon which he claimed of Moore a discount of nine per cent. to make it cash. Moore declined to pay the nine per cent. and went out of his office with it, and soon returned with $300, which he paid to Bean. At the time the bond was made, Bean testifies that Moore said, "You know why I take this in Lorenzo's name." The title had never passed from Bean to Lorenzo Moore, and the estate was not redeemed by the Boothbys, they denying the validity of Bean's claim on the ground, as I understand, that the conveyance made by Mrs. Boothby to Bean was not valid under the laws of Maine at that time, the property having originally been the estate of her husband, and he not having joined in the conveyance to Bean. The title to the estate is now in litigation before the supreme court of this state, in an action brought in Bean's name for benefit of Lorenzo Moore

against Mrs. Boothby for possession of the premises.

Boothby and his wife were produced as witnesses by the creditors; he testified that "In the spring of 1867, the bankrupt was at our house and then stated, that he had paid out $700, and he wanted that amount out of the property, but would give in the interest, that he was making a loss at that rate; my wife said, she did not see how he was the loser, if Lorenzo Moore owned the property; he replied, the money was his, the money he paid for that stand was his own property, and he could not afford to lose it and that he never thought we would cheat him out of that amount of money, he said we should be much better off than he would, as he had lost the interest of his money, whilst we had received the rents; he said, he had paid Bean $700 for his title to the property."

Mrs. Boothby's version of this conversation is, that "Moore said he wanted us to pay $700 he had paid to Bean, he said the money was his and he was poor and was not able to lose it, said we should be doing better than he did, as we were receiving the rents, and he was getting nothing, besides losing the interest of his money, do not remember about Lorenzo's title being mentioned."

The bankrupt in his examination states that he paid Bean $700 for his interest in the estate, and took a bond for the conveyance of the same to Lorenzo Moore, the money which he used being Lorenzo's, and the draft of $300 testified to by Bean, being a draft for that sum which he had received from Lorenzo, drawn by a banker at Independence, Iowa, in favor of Lorenzo Moore, on a bank in Boston or New York, the money from which draft he paid over to Bean. He admits having a conversation with Boothby and wife, and in that conversation may have said, "I had paid Bean the $700 and could not afford to lose it," or words to that effect, but that in the entire conversation he was speaking and acting in behalf of his brother; that Bean's testimony was correct, excepting that he had no recollection of using the words "You know why I take this bond in Lorenzo's name."

Lorenzo Moore testified that "In 1863 I sent home to Luther $700, or $800, in three drafts from Independence, Iowa, the money being sent to him to invest for me; that in 1863 Luther did invest for me $700 in the Laconia property, whilst I was in Iowa; I instructed him to invest it for me if he saw a chance to make money, and I would share the profits with him. When I came back he told me, he had invested it in the Laconia property; has invested other monies for me, and we had divided the profits, about $300 on Chas. Boothby's place, and something over $100 on the Mill's lot.

The bankrupt's statement as to the Laconia stand is in all respects sustained by that of his brother, and I think also derives some support from Bean's testimony, as to

the $300 draft offered to him by Luther, at the time of giving the bond. On the other hand, there is the testimony of Boothby and wife as to the alleged admissions of the bankrupt claiming an interest in the property, and that the $700 paid to Bean was his own money.

In my opinion, verbal admissions are the most dangerous and unreliable testimony which can be produced to a court of justice, and but very little reliance should be put upon them, when presented from interested witnesses, under circumstances similar to these in the present case. They consist of a mere repetition of statements made long since, and depend entirely upon the honesty, intelligence, and recollection of the witnesses, and in all cases, after a considerable lapse of time, when a witness undertakes to rehearse, from his recollection alone, the exact language and expressions of a party, I am but little inclined to yield a ready credence to its entire correctness; an unintentional change of a few words may give a meaning to the statement entirely different from what the party actually did say.

In the present case, these two witnesses do not entirely agree in their recollection of the conversation. Boothby states that his wife said she did not see how he, Luther, was a loser, if Lorenzo Moore owned the property; whilst the wife says she does not recollect about Lorenzo's title being mentioned. If the wife had made such a remark, it seems to me she would have been more likely to remember it than any other part of the conversation, as it was her idea, and the most important, in my view, of anything testified to by either witness.

The position, assumed by these witnesses in their defence of the suit, brought against them in Bean's name for the recovery of the estate, I admit, is not without its effect on my mind, and has greatly diminished the respect and confidence which I might otherwise entertain for them, and the credence which I might have given their testimony. They stand before me in hostility to the Moores, are defendants in a suit for the recovery of this estate, putting a defence upon the strict law, that the husband did not join in the conveyance with his wife, notwithstanding he was a party to the agreement, present when it was made, acted throughout as agent for his wife, and received from Bean his money. all parties implicitly believing that Bean by the deed acquired a valid security on the estate for his loan. Instead of paying back the money without interest, the use of which they had enjoyed for more than three years, and which amount they admit Moore was willing to accept, they see fit to defend on this strict technicality, the non-joinder of the husband in the deed.

It may be, that under the laws of Maine. this defence will prevail; but it does not

commend to my consideration very favorably those who are endeavoring to profit by it; and they should not expect any tribunal to place any great reliance on their statements as to the admissions of their opponents touching the title to the estate in question.

I should fear that parties entertaining such loose notions of what is right, honest and honorable. could not always be depended upon when called to testify as witnesses, and I should feel great reluctance in deciding this matter against the bankrupt upon their evidence, even if entirely uncontradicted; but as the case now stands, upon all the testimony in relation to the Laconia land, I have no question that the money advanced to Bean was Lorenzo Moore's property, and the bond for the conveyance from him was properly taken in the name of Lorenzo Moore, and that the bankrupt acquired thereby no interest in this estate. The money advanced to Bean having been the property of Lorenzo Moore, the most satisfactory reason is shown for taking the bond in his name, and we have no occasion for indulging in loose conjectures for other reasons, if the bankrupt did make the remarks testified to by Bean.

I have never entertained any question as to the judgment which should be rendered upon the specifications already adverted to, but there is one still remaining for my decision, upon which there is a very considerable conflict of evidence. I have repeatedly read all the testimony applicable to this objection, but have been unable to reconcile the statements of all the witnesses, or to feel such absolute confidence and trust in the conclusion arrived at by me, as I could have desired.

The fifth specification charges the bankrupt with having on his examination before the register willfully and knowingly sworn falsely, viz: "that since Feb. 22, 1858, he kept no cash book, and no written account in any shape of any receipts or expenditures from that date, except receipts on the files of said bankrupt, and loose memoranda of money borrowed or had for the time being, when in truth and in fact, he had kept a cash book and cash account since that date." Such is the statement, repeatedly given by the bankrupt in his written examination, and its materiality is not denied by his counsel.

The charge therefore is that of willful falsehood, and is a question of fact submitted to me, for my decision, involving a trial of the bankrupt for the crime of perjury. The consequences being of such extreme importance. in determining the question, I must be governed by the rules of law regulating the trial of an indictment for perjury. The creditors should satisfy my mind beyond a reasonable doubt, that this bankrupt has intentionally and willfully given false testimony in relation to this matter.

· It is undisputed, that prior to Feb. 22, 1858, the bankrupt did keep what he terms cash books, showing, in part, his receipts and payments of money from January 1, 1848. Four of these books have been produced and carefully examined by me. The bankrupt states that he abandoned his practice of keeping such books in February, 1858, on account of manifold errors and omissions. Some of the testimony on the part of the creditors is in my opinion easily explained, whilst other portions must depend on the intelligence, character and memory of the witnesses, and their relations to the bankrupt, as it is direct, positive and unqualified, as to the fact that the bankrupt did, subsequently to Feb., 1858, keep such books.

The evidence on the part of the bankrupt, and especially that gathered from his books, does certainly throw great doubt and uncertainty over the proof offered by the opposing creditors, and leads me to the conclusion that there may have been some mistakes, or failure of memory, on the part of their witnesses. I am not convinced that the bankrupt did keep a cash book, or cash accounts, during the time charged in the specifications. I am left in doubt from all the testimony, but am the rather inclined to believe that the statements of the bankrupts in relation to this matter are correct. Discharge granted.